IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 14, 2018

**JAMES MICHAEL NAIVE v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Williamson County**
**No. II-CR-105236-PC     Joseph Woodruff, Judge**

_____

**No. M2017-00278-CCA-R3-PC**

_____

A Williamson County jury convicted Petitioner, James Michael Naive, of the first degree premeditated murder of his sister. The trial court sentenced Petitioner to life imprisonment. On appeal, this court affirmed the judgment of the trial court. *State v. James Michael Naive*, No. M2012-00893-CCA-R3-CD, 2013 WL 4505395 (Tenn. Crim. App. Aug. 21, 2013), *perm. app. denied* (Tenn. Dec. 11, 2013). Petitioner filed a post-conviction petition, and the post-conviction court denied relief following an evidentiary hearing. On appeal, Petitioner maintains that he received the ineffective assistance of counsel in that trial counsel's defense strategy was unlikely to be successful, and trial counsel failed to advise Petitioner that his testimony was essential to his defense. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Richard C. Strong, Nashville, Tennessee, for the appellant, James Michael Naive.

Herbert H. Slatery III, Attorney General and Reporter; Linda D. Kirklen, Assistant Attorney General; Kim R. Helper, District Attorney General; and Mary K. White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts*

The facts underlying Petitioner's conviction were set out in detail in this court's opinion on direct appeal. *State v. James Michael Naive*, No. M2012-00893-CCA-R3-CD, 2013 WL 4505395 (Tenn. Crim. App. Aug. 21, 2013). In summary, Petitioner had

an on-going dispute with his sister over control of their elderly parents' bank account and physical care. On the afternoon of July 16, 2010, police responded to a call about a shooting at Petitioner's parents' residence. Petitioner had called 9-1-1 to report that he had accidentally shot his sister in the head. When officers arrived, Petitioner put his hands in the air and began walking towards the officers. Petitioner told the officers that he had shot his sister. Officers entered the residence and found the victim had been shot in the head. It appeared that the victim had been seated on an ottoman when she was shot and she had fallen backward onto the floor. Officers recovered a firearm from a rocking chair in the living room. The gun was fully loaded, except one round had been fired.

Petitioner was taken into custody and interviewed by police. Petitioner's demeanor was calm, cooperative, and compliant. Petitioner told the lead investigator, Lieutenant William Ambrose, that his family owned the Brentwood residence where the shooting occurred and a large farm in Shelbyville. Petitioner had been caring for his elderly parents. Petitioner told Lieutenant Ambrose that the victim had "invaded" his parents' residence and "broke[n] into the bank accounts." About the incident, Petitioner told him that his sister "starts with [their father,] and he starts screaming . . . you're killing me, y'all are killing me, y'all are killing me. So I walked upstairs and killed her."

*Post-conviction hearing*

Petitioner testified that he was represented at trial by two attorneys with the public defender's office, who will be referred to in this opinion as "trial counsel" and "co-counsel." Petitioner discussed with trial counsel witness interviews with his elderly parents, his daughter, some of his parents' caregivers, and character witnesses, but he did not believe trial counsel conducted interviews with those people. Petitioner testified that "the communication [between him and trial counsel] wasn't that good at all." Petitioner asked trial counsel to request his medical records from the Veterans Administration because the records would show "the stress levels that [he] had gone through" as a result of caring for his elderly father. Petitioner testified that trial counsel reviewed discovery with him and that, "[a]ccording to [Petitioner's] records, [they] met 13 times."

Petitioner testified, "[t]his [case] was in my mind never about an acquittal." He believed he was guilty of manslaughter rather than premeditated murder. Petitioner testified that trial counsel did not discuss strategy with him, but it was Petitioner's understanding "that it would be defense of a third person. . . ." Petitioner's defense was based on his belief that his sister had threatened his father, and Petitioner believed that his sister would harm his father. Petitioner testified, "you've got an old man hollering you're killing me, you've got somebody out of control and what do you do? So, I did what I did. I went and got a gun and tried to get her out of the house and ended up killing her, in which I'm, you know, I'm sorry about that." Petitioner testified, "I came down behind

- 2 -

her, hollered at her, and she didn't do nothing [sic]. I hollered at her again and she came up and hit the – she was bent over daddy. She came up like that, hit the gun barrel and it went off." Petitioner testified that he could not remember whether he discussed accidental discharge with his trial counsel. He testified, "I don't remember ever going into any real in-depth discussions like we're having right now with [trial counsel and co-counsel]."

Petitioner acknowledged that he admitted to police that he shot and killed the victim. He testified that he did not explain to police the circumstances or family issues surrounding the incident because he was "in a state of shock" and he believed that "there would be further investigation and [he] could clarify some of these things . . . ."

Petitioner testified that a few days before his trial was scheduled to begin, one of his trial counsel "comes to me and says, 'I don't want you to testify.'" Petitioner testified that trial counsel explained that he was "going to appeal on *Miranda* question, the statements [Petitioner] made [to the police]." Petitioner heeded trial counsel's advice because, he testified, "I've been taught all my life you go with professionals, you know, you – you listen to your attorneys and stuff." Petitioner testified that his sister "was very vocal to everybody but [their] father about hating [their father]."

Petitioner testified that he experienced post-traumatic stress after serving in Vietnam. Petitioner believed that trial counsel's defense strategy would involve raising a defense of diminished capacity based on the conclusion of Dr. Keith Caruso, who conducted a psychological evaluation of Petitioner. Petitioner testified that trial counsel told him that Dr. Caruso was "not going to help [them]" because he did not support a defense of diminished capacity. Petitioner learned after trial that Dr. Caruso questioned Petitioner's truthfulness during the evaluation. Petitioner would like to have cleared up the doctor's concerns or subpoenaed him to testify at trial to explain.

On cross-examination, Petitioner acknowledged that the trial judge questioned him about his understanding of his right to testify. Petitioner testified that trial counsel did not explain to him "how critical [his decision not to testify] was to his defense." Petitioner testified, "I knew I was waiving my right to testify." He testified, "I had no idea how critical it was." Petitioner testified that he told the police his father was screaming, "[y]ou're killing me, you're killing me, you're killing me." Petitioner told police he "[p]ut the gun to the back of her head, hollered her name and she was dead, basically." He testified that he believed there would be "further investigation and [he] could get to the fine points. That never happened."

Petitioner's trial counsel testified that he had worked as an assistant district public defender since 2006. Trial counsel represented Petitioner at the preliminary hearing in

the General Sessions Court. Trial counsel filed motions to suppress Petitioner's statement, items found in the search of Petitioner's home and vehicle, and bank records. Trial counsel testified that he reviewed Petitioner's initial psychological evaluation, which was conducted by the Guidance Center, and "there was no basis" for an insanity or diminished capacity defense. Trial counsel testified that Petitioner's VA records did not contain a diagnosis of post traumatic stress disorder (PTSD). Trial counsel hired Dr. Keith Caruso to conduct a second evaluation of Petitioner. Trial counsel provided Dr. Caruso with Petitioner's VA records, as well as discovery he had received from the State. Dr. Caruso initially opined that a defense of diminished capacity could be supported; however Dr. Caruso subsequently changed his opinion and concluded that neither insanity nor diminished capacity was supported. Trial counsel testified that Dr. Caruso's "position was pretty damaging to the defense. He simply did not believe [Petitioner]. Dr. Caruso opined that – that it was premeditated murder." Dr. Caruso found that Defendant did not suffer from PTSD.

Trial counsel testified that he met with Petitioner on approximately 20 to 30 occasions. He testified that each meeting lasted "at least an hour." Trial counsel testified that Petitioner "seemed quite satisfied with the investigation" of his case. Trial counsel spoke to several members of Petitioner's family. He did not interview Petitioner's parents because they had dementia, which was well documented. Trial counsel took photographs of the crime scene. Trial counsel discussed with Petitioner the defense of a third party. Trial counsel testified, "[t]he problem with that defense is, and [Petitioner] knew this, was going to be the cross-examination regarding that defense." Trial counsel explained that Petitioner would be asked on cross-examination by the State about using more force than was necessary to eliminate the threat. Trial counsel believed that the State could prove premeditation if it was able to establish that Petitioner killed his sister to prevent her from having "unfettered access" to their parents. Trial counsel testified that Petitioner "agreed [ ] that cross-examination would be damaging." Trial counsel added, "everything [Petitioner] was going to testify to was in that interview" with the investigating detective.

Trial counsel and Petitioner discussed Petitioner's claim that the gun accidentally discharged. Trial counsel testified that Petitioner "essentially told [him] that's not what happened," and trial counsel advised Petitioner that he could not allow Petitioner to perjure himself. Trial counsel testified, "we went back to the possible cross-examination on that issue and he ultimately agreed that that would fall by the wayside as well because he never said it to the police."

Trial counsel testified that the State's evidence of premeditation included ammunition found on Petitioner's bed and the fact that Petitioner went upstairs to retrieve the gun before shooting the victim. Police also found several hand drawn shooting

targets in Petitioner's bedroom that looked very similar to the victim. Trial counsel testified that Petitioner "was always pretty cognizant of his rights," and that Petitioner agreed with trial counsel that he should not testify. Trial counsel called Petitioner's brother, who had power of attorney for Petitioner's parents, to testify that Petitioner did not have a financial motive to kill his sister.

Another assistant public defender, who had 39 years of experience, acted as co-counsel for Petitioner. Co-counsel testified that he and trial counsel met with Petitioner "in excess of 20 times. Most of the time, it was more than an hour because there was a lot of discussion." Co-counsel testified that they discussed Petitioner's case with him "in detail." Co-counsel testified that the video recording of Petitioner's statement to police "was [their] best bet as far as getting sympathy [ ] from the jury" because Petitioner expressed emotion and cried during the interview. Co-counsel testified, "I think it would have been a disaster if [Petitioner] had testified [at trial]." Co-counsel testified that he and trial counsel spoke to all of the State's witnesses and "any witnesses that [Petitioner] wanted us to talk to, we talked to." Co-counsel testified that he and trial counsel discussed defense strategies with Petitioner "for hours [and] hours on end." Their trial strategy was to get a conviction for a lesser-included offense, such as manslaughter. Co-counsel and trial counsel spoke to Dr. Caruso several times to be sure he considered all circumstances and facts that might support a diminished capacity defense.

Detective James Colvin assisted in the investigation of the shooting. Detective Colvin attempted to interview Petitioner's father, who "would bounce back and forth between the events of that particular day, and something that occurred 40 years ago." He testified that Petitioner's mother "was in much worse shape" than his father and that she could not remember her children's names. Detective Colvin found a paper in Petitioner's desk that had handwritten notes about manslaughter and wrongful death on it. Detective Colvin testified that he found no evidence that the gun accidentally discharged as Petitioner claimed. He testified that an autopsy of the victim did not reveal any soot or stippling on the victim's head.

In a written order denying post-conviction relief, the post-conviction court concluded that Petitioner failed to prove by clear and convincing evidence that defense counsel's performance fell below the standard of competence for criminal defense attorneys or that there was a reasonable probability that he would have been acquitted of first-degree premeditated murder but for the actions of trial counsel. The post-conviction court noted, "Petitioner's sole proof in support of his claims was his own testimony, which often was contradictory and ultimately unconvincing." The post-conviction court credited trial counsel and co-counsel's testimony and discredited Petitioner's testimony "[t]o the extent Petitioner's testimony differ[ed] from that of his trial defense counsel." The court noted that both trial counsel and co-counsel remembered the case in detail and

"independently provided sound reasons for why they thought it was in Petitioner's best interest not to testify at trial."

*Analysis*

Petitioner contends that his trial counsel was ineffective for pursuing a trial strategy that was unlikely to be successful, and for failing to have Petitioner testify to establish defense of a third party.

To be granted post-conviction relief, a petitioner must establish that his conviction or sentence is void or voidable due to the abridgment of any constitutional right. T.C.A. § 40-30-103. The petitioner has the burden of proving the allegations of fact by clear and convincing evidence. *Id*. § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). Factual findings by the post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). This court may not substitute its inferences for those drawn by the trial judge, and "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Claims of ineffective assistance of counsel in post-conviction petitions are regarded as mixed questions of law and fact. *Grindstaff*, 297 S.W.3d at 216. Thus, our review is de novo with no presumption of correctness. *Pylant v. State*, 263 S.W.3d 854, 867-68 (Tenn. 2008) (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right to effective assistance of counsel. To prevail on a claim for ineffective assistance, a petitioner must prove "that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To demonstrate deficiency, a petitioner must show "'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 687). A petitioner "'must show that counsel's representation fell below an objective standard of reasonableness' guided by 'professional norms' prevailing at the time of trial." *Id*. (quoting *Strickland*, 466 U.S. at 688) (internal quotations omitted). On review, counsel's performance is not to be measured by "20-20 hindsight."

- 6 -

*Id*. at 277. Instead, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. (citing *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). The court must presume that counsel's acts might be "'sound trial strategy,'" and strategic decisions are "'virtually unchangeable'" when made after a thorough investigation. *Id*. (quoting *Strickland*, 466 U.S. at 689).

To establish prejudice, "a petitioner must establish 'a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.'" *Id*. (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. A petitioner must show that counsel's performance was so deficient that it deprived the petitioner "of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463). "Failure to establish either deficient performance or prejudice necessarily precludes relief." *Felts*, 354 S.W.3d at 276.

Petitioner contends that trial counsel was ineffective for using a trial strategy that was unlikely to be successful. Specifically, Petitioner challenges trial counsel and co-counsel's goal to lessen the degree of culpability. Petitioner asserts, "[w]ithout an expert to contradict the theory of premeditated murder, the strategy choice was so unlikely to be successful that it did not constitute effective assistance of counsel."

Initially we note that Petitioner does not offer an alternative trial strategy, nor did he present expert testimony at the post-conviction hearing to refute premeditation. In cases where a petitioner contends that trial counsel failed to present a witness in support of the petitioner's defense, the petitioner should present such witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Furthermore, trial counsel's strategy to reduce Petitioner's conviction to manslaughter was a carefully considered decision made after a thorough investigation and numerous discussions with Petitioner.

Petitioner underwent two separate mental evaluations. The first evaluation noted that Petitioner "appears to have been experiencing a great deal of emotional distress associated with his father's vulnerable physical state and disagreements with his sister regarding how to care for him." However, the evaluation concluded that Petitioner was able to appreciate the nature and wrongfulness of his actions and had the capacity to act knowingly and with intent. Trial counsel obtained a second evaluation of Petitioner, which also ultimately concluded that none of the evidence available supported the defense of diminished capacity.

The post-conviction court found, "[u]ltimately, defense counsel's end goal was to persuade the jury to return a verdict adopting a lesser degree of culpability[.]" Because

Petitioner confessed to police, an acquittal was unlikely. Petitioner has never denied that he shot the victim. Petitioner testified at the evidentiary hearing, "this was never about an acquittal; I was guilty, but thought it was nothing more than manslaughter. I wanted to get away from this pre-meditated thing." The State presented evidence of premeditation, including Petitioner's retrieval of a gun from upstairs, ammunition found in Petitioner's bedroom, and hand drawn targets that resembled the victim's head.

We conclude that trial counsel's strategy and tactical decisions were sound and were made after thorough preparation and investigation. Petitioner is not entitled to relief on this ground.

Petitioner also contends that counsel was ineffective for failing to allow Petitioner to testify at trial to establish that Petitioner was acting in defense of others. Petitioner acknowledges that the trial court charged the jury with a third party defense instruction. Petitioner argues that his testimony that he believed his father was in danger was essential to establish the defense. Petitioner claims that his waiver of his right to testify was "not knowing and voluntary because his counsel had failed to properly explain all the potential consequences of his not testifying, mainly that he would not establish the elements necessary to support the general defense [ ] of others."

Both trial counsel and co-counsel agreed that Petitioner's statement could be used to benefit Petitioner by conveying his side of the story to the jury without risking the perils of cross-examination. Co-counsel testified that Petitioner expressed emotion during his statement that he believed would not be as effectively conveyed in his testimony at trial. The post-conviction court found that trial counsel and co-counsel discussed with Petitioner "the pitfalls of Petitioner testifying and the likely consequences of cross-examination." Petitioner agreed that the theory of third party defense would not survive cross-examination because, as trial counsel explained, they would have to overcome Petitioner having used more force that was necessary to eliminate the threat. Trial counsel believed that the State could prove premeditation if it was able to establish that Petitioner killed his sister to prevent her from having "unfettered access" to their parents. Trial counsel also explained that "everything [Petitioner] was going to testify to" was in Petitioner's statement to the police. This is exactly the type of "reasonable trial strategy" that we will not second guess. Trial counsel and co-counsel adequately considered the pros and cons of having Petitioner testify at trial. As such, we cannot conclude that trial counsel or co-counsel performed deficiently, nor can we conclude that Petitioner received ineffective assistance of counsel.

Furthermore, Petitioner acknowledged that he made the ultimate decision not to testify in his defense. On cross-examination, Petitioner acknowledged that the trial judge questioned him about his understanding of his right to testify. Petitioner testified, "I

knew I was waiving my right to testify." He testified, "I had no idea how critical it was." The evidence does not preponderate against the post-conviction court's finding that "at the time of trial, Petitioner concurred with defense counsel's ultimate advice that he not testify at trial." Petitioner is not entitled to relief on this ground.

CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition.

_____
THOMAS T. WOODALL, JUDGE